**\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\***

**Electronically Filed
Supreme Court
SCAP-24-0000109
15-OCT-2024
07:54 AM
Dkt. 9 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

ANGELICA JOY DAOANG,
Plaintiff-Appellant,

vs.

NICHOLAS PERRY,
Defendant-Appellee.

_____

SCAP-24-0000109

APPEAL FROM THE DISTRICT COURT OF THE SECOND CIRCUIT
(CAAP-24-0000109; CASE NO. 2DSS-24-0000031)

OCTOBER 15, 2024

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY McKENNA, J.

**I. Introduction**

This is an appeal from an order dissolving a temporary restraining order ("TRO") against harassment. Angelica Joy Daoang ("Daoang") lived in a house with her aunt Carolina

1

Balanza ("Balanza"). The house was co-owned by Balanza and Balanza's ex-boyfriend, Nicholas Perry ("Perry").

In September 2022, Perry and Balanza had obtained one-year family court restraining orders against each other. Perry did not return to the house.

On February 16, 2024, Daoang obtained a district court TRO against Perry for a February 14, 2024 incident. Daoang's district court TRO petition was brought pursuant to Hawaiʻi Revised Statutes ("HRS") § 604-10.5 (2016), relevant portions of which read as follows:

> §604-10.5  **Power to enjoin and temporarily restrain harassment.**
> (a)  For the purposes of this section:
> "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose.
> "Harassment" means:
> (1)  Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault; or
> (2)  An intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual and serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer emotional distress.
> (b)  The district courts shall have the power to enjoin, prohibit, or temporarily restrain harassment.
> . . . .
> (f)  Upon petition to a district court under this section, the court may temporarily restrain the person or persons named in the petition from harassing the petitioner upon a determination that there is probable cause to believe that a past act or acts of harassment have occurred or that a threat or threats of harassment may be imminent. The court may issue an ex parte temporary restraining order either in writing or orally; provided that oral orders shall be reduced to writing by the close of the next court day following oral issuance.
> (g)  A temporary restraining order that is granted under this section shall remain in effect at the discretion of the court for a period not to exceed ninety days from the date the order is granted . . . . A hearing on the

> petition to enjoin harassment shall be held within fifteen days after the temporary restraining order is granted . . . .
> The parties named in the petition may file or give oral responses explaining, excusing, justifying, or denying the alleged act or acts of harassment. The court shall receive all evidence that is relevant at the hearing and may make independent inquiry.
> If the court finds by clear and convincing evidence that harassment as defined in paragraph (1) of that definition exists, it may enjoin for no more than three years further harassment of the petitioner, or that harassment as defined in paragraph (2) of that definition exists, it shall enjoin for no more than three years further harassment of the petitioner . . . .

HRS § 604-10.5 (emphases added).

Daoang's ex parte petition for a TRO was granted on February 16, 2024. After a February 26, 2024 hearing, the District Court of the Second Circuit ("district court")[1] dissolved the TRO, determining there was a lack of clear and convincing evidence of "harassment" as defined by the statute.

On appeal, Daoang asserts the district court erred by (1) concluding she was a guest and not a tenant in the house, and (2) applying the wrong reasonableness standard as to emotional distress. Daoang basically asserts the district court applied a more stringent "reasonable person" standard based on Daoang's status as a guest rather than a tenant.

We need not decide the first issue on appeal, regarding whether the district court erred by concluding Daoang was a guest and not a tenant, which is a predicate for the second issue, whether the district court then applied a different

---

[1]    The Honorable Blaine J. Kobayashi presided.

"reasonable person" standard based on its erroneous characterization of her status.  This is because we disagree with the premise of Daoang's issues on appeal, that the district court dissolved the TRO based on a mistaken characterization of Daoang's status as a guest, which allegedly led to it ruling that a reasonable person in Daoang's shoes (as a guest rather than as a tenant) would not suffer emotional distress.

The district court's ruling dissolving the TRO was not based on its application of an erroneous emotional distress standard.  Rather, HRS § 604-10.5 contains two alternative definitions of "harassment," and the district court found clear and convincing evidence lacking for a finding of harassment under either alternative.

There was no evidence of "harassment" under the first definition, which basically requires physical abuse or the threat thereof.  There was no evidence of physical abuse and the district court did not clearly err in finding a lack of such threats.

With respect to the second definition of harassment, the question of whether a "reasonable person" would "suffer emotional distress" under the second definition (requiring a "course of conduct") is not reached if there is a lack of clear and convincing evidence of a "course of conduct" constituting "harassment."  By finding a lack of "past acts" of harassment,

4

the district court implicitly found lacking the requisite "course of conduct." Hence, the district court did not even reach the issue of whether a "reasonable person" would "suffer emotional distress" under the second definition.

Therefore, the district court did not clearly err by dissolving the TRO.

Although we affirm the district court, we provide some guidance in cases related to domestic violence situations.[2] This case arises out of the exclusion of Perry from a house he co-owns with Balanza, which occurred after incidents of domestic violence between them that led to protective orders. The protective orders had expired five months before the incident leading to the district court TRO, but Balanza's ouster of Perry had apparently continued.

Under real property law, Perry was also entitled to possess the house as a co-owner. But Perry had not been there since 2022 and Balanza had apparently changed the keys, so Perry entered the house through a window. Although Perry understood Balanza to be out of town, he did not know whether others would be present in the house.

Based on the in-court proceedings here, Perry might have inferred that the district court condoned his efforts at self-

---

[2] HRS § 602-4 (2016) provides, "The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

help.  In situations related to domestic violence cases, courts should proactively consider possible steps to reduce the risk of future conflict.  To avoid situations that could lead to unnecessary physical confrontations in cases related to domestic violence, courts should consider providing information to parties regarding other legal avenues and alternative resources through which they may be able to assert their rights and resolve their differences.

In terms of the legal issues raised in this appeal, however, based on the record, the district court did not clearly err by determining there was a lack of clear and convincing evidence of harassment.  We therefore affirm the district court's February 26, 2024 order dissolving and dismissing Daoang's TRO with prejudice.

## II.  Background

### A.  Factual background

#### 1.  Previous cases between Balanza and Perry

Daoang's February 15, 2024 petition for TRO discusses a family court order of protection that Balanza had obtained against Perry in 2022 and mentions that Balanza and Perry were litigating child custody in a separate case.  Daoang indicated that Balanza had been awarded sole physical custody of her children with Perry, that Perry had visitation, and that a court

order required them to have no contact except to exchange their children (Daoang's cousins) at the Wailuku Police Station.

Perry and Balanza had actually obtained family court domestic abuse TROs against each other on September 8, 2022, each alleging physical abuse by the other.[3] At a September 19, 2022 hearing on both petitions, the family court issued orders of protection in both petitions for one year, until September 19, 2023. Both restraining orders indicate there had been abuse committed by Perry and Balanza.[4] In both orders, the family court ordered Perry to stay away from the house he co-owns with Balanza. The family court also ordered visitation for Perry from Friday at 6:00 p.m. until Sunday at 6:00 p.m. with exchanges of the children to occur at the Wailuku Police Station parking lot.

On August 29, 2023, Balanza filed a motion to extend her protective order. She alleged Perry had violated her existing order for protection on April 10, 2023 and May 19, 2023, and that there were police reports regarding both incidents. This motion was heard by the family court on September 18, 2023. Balanza appeared pro se. Perry's counsel requested that the

---

[3]   2FDA-22-0000724 & 2FDA-22-0000726. This court can take judicial notice of these cases, whether requested or not. Hawai'i Rules of Evidence Rule 201.

[4]   Each restraining order contains a provision stating that the respondent is to be restrained "from committing further acts of abuse or threats of abuse."

family court allow both restraining orders to expire, without extension, and the family court agreed.

Thus, Balanza's and Perry's restraining orders against each other expired on September 19, 2023, and were no longer in effect as of the February 14, 2024 incident alleged in Daoang's petition.

## 2. Daoang's allegations regarding February 14, 2024 incident

Daoang's written explanation in support of her district court TRO petition said she had begun living at Balanza's house in Wailuku since June 2023. On February 14, 2024, Balanza texted her and told her to make sure all the doors and windows at the house were locked because Perry was "acting stupid" and might try to come to the house while she was out of town. Daoang did so, then went to her grandmother's house for dinner. When she returned, all the lights in the house were on and a car she didn't recognize was parked in the driveway.

Daoang called Balanza, who told Daoang to take a photo and send it to her, and that she would call the police. Daoang waited at a nearby park until police and family members arrived at the house. When the police arrived, they went inside and spoke with Perry. The police came out and said they would not do anything because Perry co-owned the house.

Perry then began taunting Daoang and her family members. The police discouraged her from entering the house because it would escalate the situation. When she indicated she lived in the house, the police said she could enter to grab some necessary items for a short stay away from the house. Daoang entered with her uncle. Perry was laughing and recording them. When Daoang went to the bathroom, she noticed that the window was open, and it appeared someone had crawled through it to get inside. Daoang exited the house with some of her things.

Balanza then asked her to go back inside to video record the contents in the house. As Perry had not been in possession of the house for years and had no personal items there, Balanza was concerned that he might take things. Over Perry's objection, the police allowed Daoang to reenter. As she took pictures and videos, Perry made snide remarks and alleged Daoang was not properly living at the house and was engaging in illegal activity. The police intervened to stop him.

Daoang started crying and tried to leave the house. The police had to physically put space between her and Perry because he was following her throughout the house. As Daoang headed downstairs, she noticed that the door to her room was unlocked. She told the police and Perry she hadn't given Perry permission to unlock or enter her room.

The police indicated she could take whatever she needed immediately. But she couldn't easily take all of her computer equipment, which she used for work. She lived at the house and worked mostly from home.

Frustrated, Daoang decided to just leave and come back later. Her aunt had instructed her to take all the mail before she left. As she collected the mail, Perry insisted that she go through each item to ensure she didn't take any mail addressed to him even though he hadn't lived at the house for over two years and no mail for him was being delivered there. She also removed her aunt's mail, purse, and jewelry from the house.

The police indicated to Daoang that she should get a TRO.

In her petition, Daoang maintained that Perry lived elsewhere, had not re-established possession of the house after the family court protective order, and that Balanza was working on buying out Perry's interest in the house. Daoang believed that Perry's entrance into the house through the window because he did not have the keys, his conduct toward her as she was in the house, and following her around, constituted harassment. She expressed fear for her safety as well as for the potential of further harassment. She reiterated that she was her aunt's tenant, indicated that she was having to find places to sleep day to day, expressed concern that Perry may have interfered with her work equipment or papers, and that she was unable to do

most of her work while effectively being excluded from the home. She indicated Perry's actions had continued to cause serious emotional distress and stress.

### 3.   District court TRO and hearing

Based on Daoang's petition, a district court TRO was issued the next day, on February 16, 2024.  A hearing was held on February 26, 2024 to determine whether an injunction should issue.

At the hearing, the district court first confirmed that Daoang stood by the truthfulness of all the statements in her petition and that she had nothing to add.

The district court then invited Perry to testify.  Perry testified he had not been to the house from the September 2022 TRO until February 14, 2024.  He indicated he had stayed away because Balanza rebuffed his efforts to enter and that every time he'd gone previously, there had been abuse from Balanza. He said he decided to show up when he knew she was out of town to collect the remainder of his things, such as documents.

When Perry entered the house, he found mail from two other occupants that had been living there unbeknownst to him, who he referred to as "tenants."  Upon entering what had been his downstairs office, he saw a bed, desk, computers, and posters, stating in court, "And mind you, I am a 50 percent owner of this house.  I know none of that."  He indicated that his mother, who

11

was with him in the house heard a car door slam outside. She went into his son's room to avoid a confrontation. The next thing he knew, there was a police officer standing in his bedroom door asking what was going on, and he explained the situation.

The district court then asked Perry about the family court order of protection. Perry explained it was no longer in effect. Perry expressed frustration that he had not been allowed back into his house and that Balanza was treating the house as hers alone. He indicated he wanted to check out the house because the restraining order had expired and he'd been asking Balanza to sell the house since February 2023. He also expressed frustration that Balanza now had tenants living in the house without his knowledge and that she was making money from his property.

Perry also expressed his belief that Balanza had manipulated Daoang into believing he was not allowed into the house despite him having half ownership. He denied harassing or intimidating Daoang and said he had told her to go grab her things and that he had no problem with her. He asserted Daoang's cousin was actually trying to call him out as if he wanted to fight. He expressed his belief that Daoang had become intimidated and panicked because "it's been a thing to keep it secret from me that she's being living in my house."

12

The hearing then proceeded as follows:

**THE COURT:** How -- how is it that you -- ah, do you have some kind of rental agreement with your auntie?

**MS. DAOANG:** Ah, not on paper, but she allowed me to come into the house, um, after I moved back from Washington, ah, last year.

**THE COURT:** And is your auntie charging rent to stay at the house?

**MS. DAOANG:** Ah, no, I just help out when -- whenever I can.

**THE COURT:** Do you disagree that the respondent is, ah -- you don't disagree that he co-owns the house; right?

**MS. DAOANG:** No, I (inaudible).

**THE COURT:** Okay. So and you don't disagree that the Family Court order of protection that you reference in your petition is dissolved at this time?

**MS. DAOANG:** Yes, (inaudible).

**THE COURT:** Okay. So can you tell the Court what is, I guess, your legal right to prohibit an owner, a co-owner of the home, from coming into his home? I'm a little bit confused about that.

**MS. DAOANG:** Yes. Ah, well, the definition of harassment, um, is intentional -- intentional or knowing course of conduct directed on an individual that seriously alarms or disturbs consistently or continually that others --

**THE COURT:** No, I -- I know what the definition of harassment is. I'm trying to find out what legal right do you have to prevent an owner of the property from coming to the property?

**MS. DAOANG:** Well, when I went to the property I was being harassed. I was being followed around the home. And I believe that as a tenant I have rights to decline (inaudible) of my tenancy.

**THE COURT:** Okay. But you're not paying rent. You don't have any rental agreement or anything with your auntie; right?

**MS. DAOANG:** Ah, she allows me to be in the house.

**THE COURT:** I mean you're -- you're basically a guest there. You're not actually a tenant as is defined under the law; right?

**MS. DAOANG:** I believe I -- I'm a tenant.

**THE COURT:** Okay. How do you believe you're a tenant --

**MS. DAOANG:** Because I --

**THE COURT:** -- if you're not paying rent, there's no rental agreement? You're just being allowed to stay there.

**MS. DAOANG:** I live in the home and I've been living in the home and she told me I can be there.

**THE COURT:** Okay. Well, let's accept that for now that you're -- you're allowed to be there. So it kind of goes back to the question that I asked earlier is how can you prevent somebody who owns the house from coming to his house?

**MS. DAOANG:** I wasn't preventing him in the beginning, but because when I came to the house I was being harassed --

**THE COURT:** Okay. When you say you were being harassed, what exactly was he doing?

13

**MS. DAOANG:** He was making comments to me. Told me I was there illegally. He was following me around the house. He was just making comments to me. Laughing at me. Recording me.

**THE COURT:** What -- what kind of comments was he making to you?

**MS. DAOANG:** He told me I was there illegally and I shouldn't be there. And he -- I shouldn't be able to go into my room because it used to be his office.

**MR. PERRY:** All of this was with the police presence by the way. They -- they saw me and talked to me for half an hour before any of this interaction that she claims (inaudible).

**THE COURT:** Ah, ah, oh and okay. Let's, um, Ms. Daoang, let's -- let's try and fit the script here. Um, what if you were -- you were faced with the situation that he was faced with. In other words, you own a home. You go to your home and you find out that somebody's living there that you had no knowledge about. What would your reaction be?

**MS. DAOANG:** I understand that. But I wouldn't go to the extent to taunt and laugh, antagonize that person.

**THE COURT:** You have anything else you wanted to say?

**MR. PERRY:** Um, she claims that Carolina called her earlier in the day and said that Nick had been acting stupid. To lock all the doors and windows. So they were well aware that I was coming. She's acting stupid. I have the text messages between me and Ms. Balanza. I said, hey there, is there -- I said, hey, is there an extra key or anything? I'll be coming by the house later on today. And did your sister find [one of the children] yesterday? She never responded. That's what I said. Did your sister find [one of the children]. She never responded. Her answer to that was, you are not allowed in my house. Three exclamation points. And if you need to retrieve something you can wait till I get back. And my response was, excuse me? And all of our interaction. If anything, I was acting stupid or crazy or whatever they want to say, that is -- I have screenshots of the text messages. They knew and tried to lock the house up and everything before I got there. She had called, per her statement, Carolina, so they knew I was the one that was in the house. They know I'm allowed in the house because the TRO's been dissolved and they still went and called the cops. Called her family to come. They did the harassing me and intimidating me through this whole ordeal. But I haven't gone to my house in a very long time because I'm afraid of coming back to court again because she's hair triggered to call the courts and keep me away from my house.

The district court then ruled as follows:

**THE COURT:** Okay. Okay, the Court has listened to the testimony of the petitioner and the respondent. And the Court has, again, also reviewed the, ah, petition for temporary restraining order that had been initially granted in this case. Ah, the law requires that there be clear and

14

> convincing evidence that the past acts of harassment have occurred and that the threats of future acts of harassment requires the Court to grant an injunction. Um, based on the facts and circumstances of this case the Court does not believe that the petitioner has met her burden to justify the Court granting an injunction in this case. So the temporary restraining order that was issued in this case is dissolved effective immediately and the matter is, at this time, dismissed with prejudice.

The district court's order dissolving and dismissing the TRO with prejudice was filed on February 26, 2024.

## B. Appellate proceedings

Daoang filed a pro se notice of appeal on February 28, 2024. She filed her opening brief on April 18, 2024. On appeal, Daoang asserts the district court erred (1) in concluding that Daoang was a guest and not a tenant of the house, and (2) by using the wrong reasonableness standard as to emotional distress. Daoang asserts that the district court applied a different "reasonable person" standard based on Daoang's status as a guest of her aunt rather than as a tenant.

Perry did not file an answering brief, and the Intermediate Court of Appeals entered his default on June 5, 2024. Counsel appeared for Daoang on June 17, 2024 and filed a transfer application the next day. We granted transfer of the appeal to this court on July 8, 2024.

### III. Standard of Review

> We review a [trial] court's findings of fact under the clearly erroneous standard. A finding of fact is clearly erroneous when either the record lacks substantial evidence to support the finding, or, evidence exists to

15

> support the finding, but we are left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. We review a [trial] court's conclusions of law de novo under the right/wrong standard. Where a conclusion of law presents a mixed question of law and fact, we review this conclusion under the clearly erroneous standard. A mixed question of law and fact is a conclusion dependent upon the facts and circumstances of the particular case.

Narayan v. Ass'n of Apartment Owners of Kapalua Bay Condo., 140 Hawaiʻi 75, 83, 398 P.3d 664, 672 (2017) (cleaned up).

## IV. Discussion

### A. We need not decide whether the district court erred by concluding Daoang was not a "tenant" because it did not dissolve the TRO based on a mistaken classification of her status

On appeal, Daoang alleges the district court erred by (1) concluding she was a guest and not a tenant in the house, and (2) applying the wrong reasonableness standard as to emotional distress. The two questions are interrelated; Daoang asserts the district court applied a different reasonable person standard based on Daoang's status as a guest of her aunt, rather than as a tenant, and thereby applied an erroneous emotional distress standard. Daoang asserts that application of the incorrect standard resulted in an erroneous dissolution of the TRO.

Daoang's questions relate to the second definition of "harassment" in HRS § 604-10.5(a):

> §604-10.5 **Power to enjoin and temporarily restrain harassment.** (a) For the purposes of this section:
> "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose.

> "Harassment" means:
>     (1)  Physical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault; or
>     (2)  An intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual and serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer emotional distress.

HRS § 604-10.5 (emphases added).  In other words, Daoang asserts that the district court categorized her as a guest, rather than as a tenant, and determined that Perry's conduct would not have caused a reasonable person who was a guest, and not a tenant, to suffer emotional distress.

Daoang's assertion that the district court determined her to be a guest and not a tenant has merit.  The district court's questions and comments to Daoang, quoted above, clearly indicate it concluded Daoang was not a "tenant."  The district court apparently based its conclusion on the lack of a written rental agreement and a lack of regular rental payments.  Although neither is required by Hawai'i law to create a tenancy,[5] we need

---

[5]     HRS § 521-8 (2018) includes the following definitions:

.  .  .  .
"Dwelling unit" means a structure, or part of a structure, which is used as a home, residence, or sleeping place by one person or by two or more persons maintaining a common household, to the exclusion of all others.
.  .  .  .
"Landlord" means the owner, lessor, sublessor, assigns or successors in interest of the dwelling unit or the building of which it is a part and in addition means any agent of the landlord.
.  .  .  .
"Rental agreement" means all agreements, written or oral, which establish or modify the terms, conditions, rules, regulations, or

17

not decide whether the district court erred by ruling that Daoang was a guest and not a tenant.  This is because the district court's categorization of her status is immaterial.

Contrary to Daoang's assertion, the district court did not dissolve the TRO because it determined Perry's conduct would not have caused a reasonable person who was a guest, and not a tenant, to suffer emotional distress.  Rather, as explained in the next section, the district court dissolved the TRO because there was a lack of clear and convincing evidence of acts constituting "harassment."

**B.    The district court dissolved the TRO based on a lack of acts constituting "harassment"**

HRS § 604-10.5 contains two alternative definitions of "harassment."  The first definition requires "[p]hysical harm, bodily injury, assault, or the threat of imminent physical harm, bodily injury, or assault."  HRS § 604-10(a)(1).  The record reflects no evidence of any physical abuse and the district court also specifically found no evidence of threats of such

---

any other provisions concerning the use and occupancy of a dwelling unit and premises.
. . . .
"Tenant" means any person who occupies a dwelling unit for dwelling purposes under a rental agreement.
. . . .

Also, according to HRS § 521-21(a) (2018), a landlord and tenant may agree to any consideration (not otherwise prohibited by law), as rent. Daoang indicated that although she did not have a written rental agreement with Balanza. Balanza had orally told her she could stay at the house and that she helped out as she could.

harm; this was not clearly erroneous, as there was no evidence of any threats of physical violence by Perry against Daoang.

The second definition defines "harassment" as:

> [a]n intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual and serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer emotional distress.

HRS § 604-10.5(a)(2). Under this definition, the question of whether a "reasonable person" would "suffer emotional distress" is not reached if there is a lack of clear and convincing evidence of a "course of conduct" constituting "harassment."

"Course of conduct" is defined as "a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose." HRS § 604-10.5. Here, by finding a lack of "past acts" of harassment, the district court implicitly found lacking the requisite "course of conduct." As held by the Intermediate Court of Appeals in Duarte v. Young, a single act does not constitute a "course of conduct" so as to meet the definition of harassment under HRS § 604-10.5(a)(2). 134 Hawai'i 459, 463, 342 P.3d 878, 882 (App. 2014). Daoang testified that Perry followed her around and engaged in taunting actions several times that evening. But even if we accept as true the entirety of Daoang's testimony, we agree with the district court that this would not constitute clear and convincing evidence of

19

the "course of conduct" required by HRS § 604-10.5(a)(2) to constitute "harassment."

In any event, because there was no clear and convincing evidence of a "course of conduct," the district court did not reach the issue of whether a reasonable person in Daoang's shoes, whether as a tenant or guest, would suffer emotional distress based on the second definition of harassment. Rather, the district court correctly noted that "past acts of harassment" were a necessary prerequisite finding to establish a course of conduct. Therefore, Daoang's questions on appeal lack merit.

C. **Whether or not Daoang was a tenant, in cases arising out of domestic violence situations, courts should prioritize safety**

Although Daoang's issues on appeal lack merit, we provide some guidance in cases related to circumstances involving domestic violence.[6]

This case arises out of Perry's exclusion from a house he co-owns with Balanza, which occurred after incidents of domestic violence between them that led to protective orders. The protective orders had expired five months before the incident leading to the district court TRO, but Balanza's ouster of Perry from the house had apparently continued.

---

[6] HRS § 602-4 (2016) provides, "The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law."

In matters arising out of domestic violence situations, which implicate safety concerns, best practices call for judges to be aware of other cases relating to the pending case.[7] Daoang's TRO petition referenced a family court restraining order, and the district court appropriately asked about the status of that order.

Under real property law principles, Perry was entitled to possession of the house as a co-owner. The record, however, indicated Perry had not been at the house since 2022 and that Balanza had excluded him from the house. She had apparently changed the keys, so Perry entered the house through a window. There had been previous domestic violence between Perry and Balanza. Although Perry understood Balanza to be out of town, he did not know whether others would be present in the house.

The district court asked Daoang questions such as "I'm trying to find out what legal right do you have to prevent an owner of the property from coming to the property?" and "How can you prevent somebody who owns the house from coming to his house?" The court's questions might have led Perry to assume that his self-help was appropriate. Given the circumstances

---

[7] See, e.g., Family Violence Prevention Fund, Creating A Domestic Violence Court: Guidelines and Best Practices (2002), p.14, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wicourts.gov/courts/programs/problemsolving/docs/dvguidelines.pdf. [https://perma.cc/95AE-P6A3]

here – which suggest a potential for future conflict, including between Perry and Balanza – the court could have appropriately suggested other legal avenues through which the parties might be able to assert their rights.  This could include information regarding neighborhood mediation centers or lawyer referral services.

### V.   Conclusion

For the reasons explained above, however, we affirm the district court's February 26, 2024 order dissolving and dismissing the TRO with prejudice.

Angelica Joy Daoang,
pro se plaintiff-appellant

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Vladimir P. Devens

